IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT
IN AND FOR ST. JOHNS COUNTY, FLORIDA

ALLEN DROZD,

       Plaintiff,

v.

CASE NO: 2019-CA-001534

AMATUS HEALTH, LLC, a foreign corporation,

       Defendant.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### JURISDICTION

1.  This is an action for damages in excess of $15,000.00.

### PARTIES

2.  The Plaintiff, Allen Drozd, resides in St. Augustine, St. Johns County, Florida, where at all times material to this complaint, he was employed by Defendant to work out of an office located at his residence in St. Augustine, Florida.

3.  The Defendant, Amatus Health, LLC., is a corporation organized under the laws of Maryland and was Plaintiff's employer at all times material to this Complaint. Defendant was at all times material to this Complaint, an organization operating substance abuse and mental health treatment facilities in several states, including Georgia, Maryland, Ohio and New Hampshire.

### FACTS

4.  In or about July 2019, Michael Silberman, Chief Operating Officer and co-owner of Amatus sought Plaintiff out for a job opportunity with Amatus. Plaintiff was formally offered a position in writing on July 11, 2019. Plaintiff presented a counter-offer regarding employment terms on July 12, 2019. On July 16, 2019, Plaintiff received a revised written offer of employment.

Plaintiff initially entered into an employment agreement with Defendant to employ Plaintiff as Chief Program Officer commencing on or about July 17, 2019. Plaintiff communicated to Amatus his desire for a long term relationship and he believed the parties anticipated a long term relationship when the employment agreement was formed.

5.  Defendant is based in Maryland, but Plaintiff received and executed the offer letter at his home in St. Augustine, Florida. Plaintiff was hired to work out of his residence in St. Augustine, Florida. Amatus was clearly on notice that they were hiring a Florida resident who would live and work in Florida when not traveling for the company. This fact was known by Amatus at the time the parties negotiated an employment agreement and it was approved at the highest levels of the company, including co-owners of Amatus, Michael Silberman, Baruch Rabhan, and Yitchok (Mark) Gold. This was expressly part of the negotiation which led to Plaintiff being hired. Indeed, the parties discussed Plaintiff's residence and Plaintiff attempted to make provisions in his employment agreement to pay him relocation expenses if Defendant later required him to move from Florida. Amatus informed Plaintiff that there were no plans for him to relocate at that time and that they would discuss this down the road in the event Defendant's expressed intention to employ Plaintiff outside of the State of Florida changed. Defendant expressly agreed to Plaintiff continuing to live and work in Florida in his capacity as Chief Program Officer. Plaintiff's official address on file with Human Resources for Defendant was his St. Augustine, Florida residence.

6.  To facilitate Plaintiff's work in Florida, Defendant provided him with remote access to Defendant's electronic files and other records necessary to perform his work remotely from Florida and when he was traveling as required for the work he was hired to perform for Defendant. In addition, Plaintiff was provided the email address of adrozd@amatushealth.com that was fully

accessible from his home office. Subsequent to the commencement of his employment, Mark Gold instructed Plaintiff to get any supplies he needed for his job and expense or charge it to the credit card Amatus provided to Plaintiff. Amatus also paid Plaintiff for travel costs to and from his home office in Florida during his employment with Amatus.

7. There was never an understanding that Plaintiff would reside in Maryland. During Plaintiff's negotiations prior to employment and during the entire course of his employment Plaintiff was never asked to relocate to Maryland or anywhere else outside of the state of Florida. Plaintiff's preference was to stay employed in Florida. Mike Silberman knew at the time of Plaintiff's hire that Plaintiff had spent more than twenty (20) years in the design and development of healthcare facilities nationwide. Such consultant functions often take place remotely in this industry. Defendant was particularly interested in two things when hiring Plaintiff: 1) stabilize the present operation, and 2) growth in other venues. The latter was to be accomplished through a combination of de novo launches and select acquisitions. Plaintiff could (and was) expected to perform both of these tasks from his home location. The team of executives Plaintiff reported to knew well that this was not only possible, but that this is how it was designed. Notably, a prior discussion regarding location expenses in the event of a move or transfer required by the company in the future was tabled during negotiations. This further evidences the company's agreement and understanding that Plaintiff would work from his home in Florida.

8. The agreement between the parties was that Plaintiff would operate out of his home and be paid by direct deposit to his Florida bank account with Wells Fargo in St. Augustine, Florida. Salary payments were always made by Defendant into Florida through direct deposits to Plaintiff's checking account with Wells Fargo in St. Johns County, Florida. When not traveling, Plaintiff communicated with text messages, emails and phone calls primarily with Mark Gold, but

3

also with other executives, including but not limited to Baruch Rabhan. Plaintiff coordinated his travel schedule and communicated with various management officials with Amatus regularly when he was working from Florida. Plaintiff participated in conference calls and performed other work from his residence in Florida.

9. Defendant has a history of operating facilities in Florida. Defendant sold two facilities in Florida in or about October 22, 2018. According a press release from the company's Chief Operating Officer Michael Silberman, "Amatus Health operated in Florida for the past 3 years, and we have decided to change our focus as new opportunities opened up for us in other parts of the country."

10. Upon information and belief, Defendant's co-owner Mr. Baruch Rabhan rarely traveled to Defendant's headquarters in Maryland and primarily worked out of his residence or otherwise from Florida during Plaintiff's employment with Defendant. Amatus and Baruch Rabhan also carried on an active business venture with The Ventura Group of Florida, Inc. commencing in July 2019. Plaintiff had introduced The Ventura Group of Florida, Inc. to Defendant. Mr. Rabhan's role was primarily to interface with investors and to deal with property acquisitions and business development which was why he was involved with Ventura and any potential investments/acquisitions of other businesses located in Florida such as Serenity and Aspire described in more detail infra.

11. Mr. Rabhan was one of the three executives to whom Plaintiff was required to report. Mr. Rabhan was directly involved in negotiating the terms of Plaintiff's employment agreement. One of those terms included a $10,000.00 fee payable to Plaintiff for each new facility upon opening. Baruch Rabhan does Amatus business in Florida and Amatus and Rabhan operate Billing and Utilization Review in Florida for several of Defendant's clients. Also Amatus'

purchase of Serenity Detox, located at 7357 Wilson Road, West Palm Beach, Florida, (Serenity House Detox, LLC), was underway during Plaintiff's employment. Further, Amatus was formed by Michael Silberman, Yitchok (Mark) Gold and Baruch Rabhan. Michael Silberman previously owned a drug treatment facility in Florida from which Amatus itself arose.

12. During Plaintiff's employment, Defendant was still seeking other business opportunities in Florida despite ceasing operations in two facilities located in Florida in late 2018. It was part of Plaintiff's job to conduct business related to Florida. For example, Plaintiff visited a facility located at 7357 Wilson Road, West Palm Beach, Florida, (Serenity House Detox, LLC) for purposes of evaluating it for potential purchase of the facility by Amatus, at the direction Defendant's CEO, Mark Gold. Defendant's owners Mark Gold and Baruch Rabhan traveled to the same facility on the same day Plaintiff did, conducting their own review of the facility prior to Plaintiff's arrival. Defendant paid for Plaintiff's car and hotel expenses for the purposes of this facility evaluation. Plaintiff evaluated the facility of a period of two days. Plaintiff communicated via email from Florida with Mark Gold, Baruch Rabhan, and Michael Silberman regarding the ongoing review of the facility on August 6, 2019. Plaintiff had also discussed with Defendant's CEO the possibility of Amatus evaluating and acquiring another facility located in Lauderhill, Florida. Notably, during Plaintiff's employment he did not evaluate any facility outside of Florida for purposes of considering the possibility of Defendant acquiring and/or creating an ongoing relationship with such an entity. Plaintiff was also asked to reach out to another Florida resident Plaintiff was acquainted with, Dr. Ashish Bhatt, M.D., to discuss potential employment with Defendant in the position of Medical Director. Plaintiff began these discussions and provided the requested information to Amatus but no hiring decision was ever finalized prior to Plaintiff's termination.

5

13. In addition to Plaintiff reviewing Serenity Detox for acquisition, Plaintiff also engaged in review/reporting on the Medical billing company (Aspire Medical Billing) Amatus was seeking to purchase. Plaintiff was asked to engage a Florida Broker, The Ventura Group of Florida, Inc., that had a listing for a property in New York. Defendant signed that Florida agreement (NDA) in regard to the acquisition. Plaintiff engaged with said Broker in Florida with which Amatus signed an NDA for a facility being reviewed. Plaintiff's contacts with the broker were all based in Florida. Plaintiff was also involved with a review related to Amatus' Florida billing operations that were being performed through Aspire Medical Billing that Defendant was preparing to purchase. Plaintiff subsequently shared concerns regarding the billing practices of Aspire via email dated August 15, 2019, and began preparing a written draft report of his findings which was not completed prior to his termination. Aspire Medical Billing is a fictitious name owned by Apex Billing, LLC. Both Aspire Medical Billing and Apex Billing, LLC are located in Port Saint Lucie, Florida. Apex Billing, LLC is a Florida limited liability company.

14. Referrals to Defendant for clinical services, as well as for licensing/compliance side work come from various locations, including Florida. Amatus' call center is nationwide and receives calls from Florida. Amatus facilities receive referrals from Florida. Baruch Rabhan does business in Florida with "investors" on behalf of Amatus. One of Amatus' websites provides that it has a "National Footprint" and represents that its "nationwide network of treatment centers and referral partners allows us to make an impact in multiple communities." Upon information and belief, Amatus does some lab work (urine screening) for facilities based in Florida, according to statements made to Plaintiff by Michael Silberman and Defendant's Director of Compliance.

15. Immediately after the commencement of Plaintiff's employment with Defendant, he was tasked with the responsibility to visit several of Defendant's treatment facilities for the

6

purpose of recommending any changes to Defendant's policies or procedures that would better enable Defendant to efficiently and successfully operate those facilities. Plaintiff traveled to Defendant's headquarters in Maryland and other facilities located in Maryland, Georgia and New Hampshire.

16. The above referenced initial travel by Plaintiff was more a function of necessity in light of the circumstances the company faced at the time of Plaintiff's hire and in light of the scope of Plaintiff's job responsibilities. Defendant's facilities were in a state of disarray and there were critical service delivery issues. This initial travel by Plaintiff was to enable Plaintiff to observe Defendant's facilities for a complete first hand view of the issues that needed to be corrected. Thereafter it was anticipated that an infrequent visit here and there would be all that was necessary on the part of Plaintiff. After this initial travel, the expectation was that Plaintiff would work from Florida, as there was no other location discussed.

17. Plaintiff was hired to perform a role for Defendant in which he was expected to oversee Amatus Health's facility service delivery models and its implementation as well as the organization's compliance and quality functions. Additionally, Plaintiff would assist in the development of new programs and facilities as well as in the acquisition of any new facilities which Amatus was seeking to add. Plaintiff was performing high level work such as detailed evaluations of work flow and evaluation to the implementation and operation of clinical services based on the facility inspections and compliance data being extracted. Additionally, Plaintiff was expected to ensure that services were being done correctly, efficiently, and that this would ensure minimizing risk, increasing compliance, and maximizing revenue.

18. Plaintiff spent approximately half of the work days during his period of employment with Defendant performing this facility evaluation work. The other half of the time

Plaintiff worked from his home office located in his residence in St. Augustine, Florida. Part of Plaintiff's job duties were on site but the lion's share of his job responsibilities and duties involved analysis and reporting which was performed from his home office. After the initial evaluations of Amatus' facilities by Plaintiff, it was expected that the great majority of Plaintiff's job duties would be performed remotely from his home office.

19. Even during the initial travel at the start of his employment, the Plaintiff's core job functions were to prepare reports which he performed almost exclusively from his home in Florida. Plaintiff would physically visit a facility and interview staff and conduct an assessment of operations. Thereafter, he would prepare a written report of his findings and recommendations for each facility. In numerous such reports Plaintiff engaged in protected activity under the Florida Whistleblower Statute and communicated these reports via email to Defendant's officers.

20. On or about July 22, 2019, Plaintiff visited Defendant's headquarters office in Owings Mills, Maryland, where he met with Defendant's Chief Financial Officer, among other individuals. During this visit to Plaintiff's headquarters, Plaintiff learned that Defendant was utilizing personal cell phones and email to transmit patient data in violation of applicable federal regulations. Plaintiff complained and objected to the CFO and others on July 22, 2019, that the services utilized by defendant were not HIPAA complaint and that Defendant should refrain from transmitting PHI in this manner. This complaint and objection by Plaintiff was for the purpose of pointing out to Defendant that it was in violation of 45 C.F.R. §164.312.

21. On or about July 24, 2019, Plaintiff met with Defendant's Chief Financial Officer, Wendy Reeling. During his meeting with Ms. Reeling Plaintiff complained about and objected to violations of various laws, rules and regulations that Plaintiff had observed during the first few days of his employment with Defendant. These violations included the failure to perform

background checks in compliance with the requirements of the Centers for Medicare and Medicaid Services or the laws of the states where various facilities are located, policies and practices in violation of state or federal wage and hour laws, and policies and practices regarding the reporting of patient abuse and similar issues. In addition, Plaintiff also complained about and objected to the violation of the HIPAA rules and regulations resulting from the utilization of unsecured equipment and personal devices, communication chains between Defendant's facilities and Defendant headquarters, and the use of personal emails and cell phones to transmit PHI back and forth through Google services and other similar unsecured methods.

22. Plaintiff met with Defendant's Chief Operating Officer and part owner, Mike Silberman and Defendant's Director of Licensing and Compliance, Nick Albaugh on or about July 24th. During this meeting Plaintiff complained about and objected to numerous issues such as the lack of medical oversight, improper admission of patients without a clinical assessment, the illegal practice of medicine by unlicensed individuals, and the reported improper "upcoding" of services billed to /Medicare or Medicaid. Plaintiff also met with Karen Moore, National director of Clinical Services to complain about and further object to some of these same issues and in particular, the lack of required clinical oversight throughout many of Defendant's facilities resulting in the improper treatment and discharge of patients based on marketing concerns as opposed to the medical needs of the patient.

23. On or about July 30, 2019, Plaintiff visited Defendant's facility in Hagerstown, Maryland, Awakenings Recovery Center and met with Defendant's regional vice president and part owner, Kabir Singh. During this visit Plaintiff learned of several health and safety violations including the fact that Defendant was preparing meals in-house and that Defendant failed to report to the state that it was receiving foods for patients from an outside organization while leading

9

officials from the state of Maryland to believe that it was utilizing a caterer that it had utilized in the past. Plaintiff complained and objected to Mr. Singh that this was a serious violation that could result in the State closing the facility. Plaintiff's complaint and objection in that regard was for the purpose of pointing out to Defendant that it was in violation of title 10 of the Maryland Code and regulations. Plaintiff also learned that the Awakenings Recovery Center routinely engaged facility patients to perform the cleaning and disinfection of facilities in the absence of any training or qualifications to perform such tasks. Plaintiff complained and objected to Mr. Singh that this practice in the absence of any cleaning protocol or chemical exposure or infection control overview posed a serious hazard to patient health and a high risk practice due to toxic chemical exposure and constituted a likely violation of OSHA regulations.

24. On the same day of Plaintiff's visit to the Awakenings Recovery Center, Plaintiff also visited Defendant's facility in Gaithersburg, Maryland, Fresh Start Recovery Center, with regional vice-president, and co-owner, Kabir Singh. During this visit Plaintiff discovered that the facility did not have a qualified Executive Director nor adequate medical supervision and a coordinated plan of care as required by the State of Maryland. Defendant was providing medical services to patients in the absence of a proper medical evaluation for the need for such services. Plaintiff complained and objected to Mr. Singh regarding each of these violations.

25. On or about July 31, 2019, Plaintiff visited Defendant's facility in Woodlawn, Maryland, Foundations Recovery Center, and met with the Executive Director, Clinical Director and with Vice-President and co-owner, Kabir Singh. During this visit Plaintiff learned that this facility was directed by Defendant to admit patients that the Clinical Director and Executive Director felt did not meet admission standards. These patients were being admitted in the absence of a proper admission assessment. Plaintiff was further informed by employees at Foundations

Recovery Center that the marketing or business development team made decisions regarding which patients get admitted, which patients get discharged and to which location patients are discharged. Plaintiff complained about and objected to the practice of allowing non-clinicians to make clinical decisions stating that this would amount to the illegal practice of medicine without a license and Plaintiff suggested that this practice should stop immediately.

26.     On or about August 8, 2019, Plaintiff visited the Defendant facilities in Atlanta Georgia, the Atlanta Detox Center and the Georgia Addiction Treatment Center. Plaintiff was informed by Matt Newsom, Regional Chief Operating Officer, and Jason Flaig, Executive Director, that the medical doctor on staff did not see any patients and was on the staff in "name only" and provided little to no medical oversight of the facility. Plaintiff complained and objected to Regional Chief Operating Officer, Matt Newsome and Executive Director, Jason Flagg that this practice was illegal and needed to be corrected immediately. Plaintiff also learned during this visit that the Atlanta Detox Center also received patients solely based on referral from Defendant that were sometimes inappropriate and not based on any clinical assessment. This facility, similar to Defendant's Foundations Recovery Center in Woodlawn, Maryland, allowed the marketing or business development team to make decisions regarding which patients get admitted, which patients get discharged and to which location patients are discharged. Plaintiff complained about and objected to the practice of allowing non-clinicians to make clinical decisions stating that this would amount to the illegal practice of medicine without a license and Plaintiff suggested that this practice should stop immediately. In a similar vein, when Plaintiff visited the Georgia Addiction Treatment Center, he learned from Matt Newsome and Jesse Stone, Executive Director, that the medical doctor on staff rarely, if ever, sees any patients.

27. On or about August 9, 2019, Plaintiff visited Defendant's facility in Concord, New Hampshire, Blueprint Recovery Center and met with Defendant's Blueprint CEO and part owner, Jonathan Gerson, Blueprint Director of Operations, Meredith Meng, and several others. Again, similar to the practice and policy he found in Defendant's facilities in Woodlawn, Maryland and Atlanta Georgia, the Defendant and employees of the facility were engaging in the illegal practice of medicine without a license. Plaintiff objected to this practice and informed Defendant's officers that the practice was illegal. Additionally, Plaintiff further learned from the Blueprint Executive Director that Defendant's Blueprint facility had been fraudulently billing for and failing to legally document services as required by law in violation of New Hampshire law. Plaintiff objected to these practices and informed Defendant's Blueprint Executive Director that this practice was illegal under both federal and state law.

28. On or about August 14, 2019, Plaintiff met with Defendant's CFO, Wendy Reeling, and discussed the above referenced issues Plaintiff discovered at Defendant's various facilities. During this meeting, Plaintiff made his objections to these illegal policies and practices known to Ms. Reeling. On the same day Plaintiff met with Defendants' General Counsel to discuss his objections to these same policies and practices. Plaintiff's General Counsel suggested that Plaintiff report these violations to the Defendant.

29. On or about August 14, 2019, Plaintiff met with Defendant's co-owners Mark Gold, Baruch Rabhan, and Mike Silberman to review Plaintiff's written findings based on Plaintiff's observations at each of the above referenced facilities. Plaintiff again made known his objections to the Defendant's illegal practices and policies referenced above. None of the Defendant's co-owners appeared to take Plaintiff's concerns and objections to Defendant's illegal practices and policies seriously in that they either voiced concerns primarily over other issues that did not

involve illegal activity or they specifically ratified or approved of certain of the illegal practices objected to by the Plaintiff. Some of the illegal practices objected to by Plaintiff during this meeting with Defendant's co-owners included violations of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), violation of various state laws regarding medical treatment and supervision, violation of state laws regarding the illegal unlicensed practice of medicine, violation of the Health Information Technology for Economic and Clinical Health Act (HITECH), violation of various laws relating to illegal billing practices, and other violations of various state and federal laws, rules and regulations.

30.    On or about August 16, 2019, approximately two days after the meeting with Defendant's co-owners referenced in paragraph 14, supra, Plaintiff was terminated from his employment via a phone call from Defendant's part owner, Mike Silberman. Mr. Silberman informed Plaintiff during this phone call that he was terminated immediately. When Plaintiff inquired regarding the reason for his termination, he was informed by Mr. Silberman that it was because Plaintiff was an "alarmist." Plaintiff further received an email following the phone call with Mr. Silberman sent by Liz Silverberg, Human Resources Generalist for Defendant, on August 16, 2019. The email provided no reason or justification for Plaintiff termination and merely stated "[t]his email shall serve as written notice of the termination of your employment by Amatus Health, LLC, effective immediately (August 16, 2019)."

31.    Plaintiff was terminated via a phone call from Defendant's part owner, Michael Silberman into Florida which was followed up with an email from Liz Silberberg also into Florida. Plaintiff's termination in retaliation for protected whistleblower activity occurred in Florida and arose from and was incident Plaintiff's employment with Defendant. As stated, supra, Plaintiff engaged in protected activity in Florida within the meaning of the Florida Whistleblower's Act

through the submission of written reports from Florida objecting to various practices. Further, Plaintiff's work related to Aspire Medical Billing in Florida occurred exclusively in the state of Florida as did Plaintiff's reports of violations of laws through illegal or inappropriate billing practices. In addition to business gains which were underway in the purchases of Serenity and Aspire, Plaintiff's employment in Florida provided Amatus a lower tax burden than the same hire in Maryland would require. The employer tax on unemployment is more favorable to Amatus in Florida than it is in Maryland. In addition, there was benefit received by Amatus from Plaintiff's work from Florida in preparing reports examining the operations of various Amatus facilities outside of Florida and Amatus received economic benefit from Plaintiff's work within Florida related to proposed or planned acquisitions of Florida based facilities.

### **FIRST CLAIM FOR RELIEF**

32. Plaintiff was terminated because of his objection to and refusal to participate in the above referenced activities, policies or practices of defendant which was in violation of various laws, rules or regulations within the meaning of Florida Statute §448.102.

33. The above actions by Defendant in terminating Plaintiff in retaliation for his objection to and refusal to participate in the above referenced policies or practices which was in violation of laws, rules and regulations violates Florida Statute § 448.102.

34. The aforementioned acts and conduct by Defendant, its agents, and employees were intentional, willful, and malicious.

35. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer lost wages, employment benefits, mental anguish, distress, loss of enjoyment of life, humiliation, great expense, embarrassment and damage to his reputation.

36. Plaintiff has been required to retain the services of the undersigned law firm and has and will continue to incur attorneys' fees as a result of Defendant's conduct as described herein.

WHEREFORE, Plaintiff demands a trial by jury on all issues triable and relief in the form of reinstatement, compensatory damages, lost wages, lost earning capacity, damages for emotional distress, loss of enjoyment of life, lost benefits, prejudgment interest and attorneys' fees, costs, and any other such relief that the Court deems just and proper.

Respectfully submitted,

/s/ Archibald J. Thomas, III
Archibald J. Thomas, III
Florida Bar No. 231657
thomas@job-rights.com
Samuel B. Kanupp
Florida Bar No. 0067216
samuel@job-rights.com
ARCHIBALD J. THOMAS, III, P.A.
4651 Salisbury Road, Suite 255
Jacksonville, Florida 32256
(904) 674-2222 (Telephone)
(904) 296-2341 (Facsimile)

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 23, 2020, I electronically filed the foregoing **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** with the Clerk of Court via the statewide e-filing portal and served by email to:

Kimberly Doud, Esq.
Nancy Johnson, Esq.
Littler Mendelson, P.C.
111 N. Orange Avenue, Ste. 1750
Orlando, FL 32801
(407) 393-2925 (Telephone)
(407) 386-8572 (Facsimile)
kdoud@littler.com
najohnson@littler.com

ATTORNEYS FOR DEFENDANT

/s/ Archibald J. Thomas, III
Attorney